Our first case for argument today is 2017-2323 Trading Tech v. IBG. Miss, is it Kurtz? Correct. Please proceed. Thank you, Your Honor. If you may please support. There are several issues before you today. I will be addressing the threshold issue of CBM jurisdiction first. The 556 claims recite an improved graphical user interface. Before you move on to that, I guess the one difficulty I'm having with this is this graphical interface doesn't seem to have any difference from say figure two except a new column of profit and loss data. Is that correct? There's more differences than just that. If you look at the claims of the patent, there are also, you know, identifying step, a long or short position that's taken by the user with respect to a tradable object for a given quantity. There is a computing step by the computing device. I'm sorry, what is the identifying step? That's the second step right after receiving. What does it do? The identifying step identifies a long or short position of a trader for a given quantity. So I hold Apple stock and I have purchased it and I'm holding a hundred. Is that a known business practice? I'm sorry, the identifying step? Is identifying a long or short hold and identifying a known business practice? I think that identifying a longer short position would be known. However, not in this aspect, in this combination. The next step is computing a plurality of values based on that long or short position, which was not done or not known, not disclosed in the prior art. Isn't that in fact the new column of data that I was just describing? I mean, the patent says figure two, it actually designates figure one and figure two as prior art, correct? That's correct. And those are both GUIs? That's right. And I'm sorry, but I still seem to not understand how this GUI has any difference from those two, but for a column of added data. At least that's what, I don't know, maybe figure nine? I can't remember the figure. That's what we relied on in our briefing was figure nine. And so that column identifies a plurality of long or short, a profit or loss associated with a position of a trader at a given quantity. And then there's an indicator that moves relative to that long or short position axis, right? So you can see that the profit or loss axis is displayed, and then you've got an indicator that moves up and down, while it certainly leverages figure two, all right? So those patents were what was discussed in CQG, in IVG. So in the prior circumstances, when somebody held a long or short position, they wouldn't know whether they would make or lose money? They'd have to calculate that, or it would be displayed. And how is that different? Or it would be displayed in a separate spot of the interface. So we would have... How is calculating? You said they would have to calculate that. For one value, or it would be displayed, but only for a single value. So the interesting thing about this invention is... Why couldn't they calculate it for multiple values? There's no evidence that anyone did that, and this was actually an enhancement to the display, because for the first time, they could see a range of price levels. They could see their profits across this range, a plurality of P&L values, and they could see how the market changes up and down. I could absolutely see how it could be... I'm sorry. I could absolutely see how it could be useful to a trader to know the profits and losses on a column. I guess I just don't understand how adding a new column of data to a display or a chart or a table is patent eligible. It's kind of a crazy concept to me. I don't see what technical problem this patent could possibly solve in light of its admission that figures one and two are prior art, and that figure eight or figure nine simply add a column with profit loss data. That's just adding information that maybe the trader would find useful, but I don't see what technological problem in the technology is being solved. Well, it improves the graphical user interface by providing... By providing more useful information to the trader. It enhances visualization with respect to understanding... What do you mean by enhances visualization? Does it change the pixel output on the screen? No, it enables a trader for the first time to see how... To see new data that they might find useful, right? To see new data they might find useful. Is there something wrong with my characterization? Well, I think that your honor... Does this or does this not provide the trader with new data they might find useful? It provides a trader with a new tool to leverage in trading. So to be clear, I'm asking you a yes or no question. Does this new column of data provide the trader with new data they might find useful? Sure, but that's not all that it's claimed. This is a new tool that a trader can use. But that's the thing, that's the only thing the patent says is different from the prior art. The patent expressly says that's what's different from the prior art. It in fact gives you two pictures that make that crystal clear. I think it's a little different, your honor. In the prior art, P&L would be displayed in a different location requiring the user to go back and forth to find that P&L calculation or they could have to calculate it manually. Okay, this for the first time calculates it for the trader across a range of price levels. So they can actually see for the first time how market changes are impacting their P&L directly. And in this court's opinion in Core Wireless, for instance, where there was a new display which leveraged prior applications and provided a summary of information on the opening display of this mobile app, for the first time you could summarize information that was displayed in other graphical user interfaces within that device. So that it was summarizing information present elsewhere, but it was doing it in a new and useful way. And that was found to be improving the functioning of the computer, just like in this case, by for the first time enhancing efficiency of a trader instead of them having to go back and forth between this location and here. It actually provides a new tool that they can use in making trading decisions, which was a really smart trader, one who played three-dimensional chess for fun. Could do that in their head, couldn't they? Could do, I'm sorry, what? Could carry the various inputs and compare them mentally. Your Honor, we actually have expert testimony about limitations on humans' brains to calculate certain number of things. And it just wasn't done, it wasn't possible. And if you're looking at this as a tool, you know, I understand you're saying that you could calculate a value, but there was no evidence at all that in the past that there would have been any display a user could go to to ascertain how my profit or loss is going to be impacted if I buy here or wait till the market moves. And that was efficient. And, you know, the size of the improvement should not be the question of whether or not something's eligible or not. Here it was undisputed that it improvement over prior graphical user interfaces in terms of the specification and in terms of what the examiner found in the file history. I'm sorry, you say it's undisputed? The evidentiary record. In the file history, in the notice of allowance, it was allowed over prior art. There was no new prior art introduced at step two, for instance, that would have enabled the PTAB to find that this was well understood routine and conventional functionality. It wasn't. In fact, the board entirely glossed over to step two of ALICE. If you look at their reasoning in appendix 38, it's just completely conclusory and doesn't cite to anything. All right. And then I'd like to point the court also to Data Engine, which TT submitted a 28-J letter after briefing had been closed. And there the court held that a more user-friendly GUI, which was more intuitive and efficient, addressed a technological problem in computers with a specific technological solution. And Data Engine, the claims there involved navigation, a 3D spreadsheet by clicking a notebook tab icon, as opposed to typing multiple commands in prior art GUIs. And that was an improvement in the GUI, an improvement in the functioning of the computer that was eligible at step one of ALICE. If we were to conclude that this was an improvement in the computer functioning, then any change in the display would always qualify as such, so long as the user found that change pleasing or interesting or valuable to them. Well, certainly ALICE contemplates that there is a big swath of potentially eligible subject matter that is computer implemented, and that we're not supposed to just cast aside all improvements because of what is perceived to be the size of the improvement. How does adding a strip of data improve the functioning of the computer? Because it provides enhanced graphical user interface functioning to a user. But isn't it just doing... you've got two pieces of information. You have profit and loss, but you have it over time when it's happening. And the beauty of the invention is that the trader can look and see what the P&L would look like if you had certain traits executed, right? That's exactly right. Okay, so embedded in the computer is all this information, and all the invention is doing is putting them together. The computer knows how to do this without any changing of how computers function. The putting into, as I understand it, putting into the software a range of hypothetical prices, and then putting in your profit and loss calculation is not hard to do. You can do it on paper. It'd take a while to do it on paper, but you basically have embedded in the brain of the little computer all this information, and somebody wrote some software and put it together. That's how, with all due respect to you, that's how I see it, and I don't see how that's teaching a computer to do anything new at all. Teach a software writer how to write some new software, perhaps. It's providing a trader with new functionality that previously was not available to that trader, and that is... But giving them the functionality isn't telling me that something magic is happening to the computer, or you were arguing over on step two, right? Well, I think that's what interfaces do, is they enhance usability. They enhance functioning of graphical user interfaces, so that the person, the user, has more ability to leverage different things. We've got tons of cases in which it seems to me that the computer has been doing similar to what you're doing here, and we have held that that wasn't sufficient to pass step two. Well, I think that the difference in those cases is if you actually look at the claim language. A lot of those are highly functionally claimed, and they're not providing a particular tool for presentation. If you look at Electric Power Group, for instance, which IB heavily relies on, in that case, if you look at the claims, they were directed to, you know, managing power grid problems using any display chart or visual. They didn't tell you how to construct the visual to display the information in a better way that'd be more useful for a user of that software. Let me throw in another question. On page 64 of the blue brief, you say the CBM review is unconstitutional. Aren't we bound by MCM versus HP? That case did not address the Fifth Amendment, and I'm glad that you went there, because I did want to highlight this issue to the court, because I think it's an important issue that was recently to our patents. This is one of 13 patents that were swept into CBM review, all directed to graphical user interfaces, and all of these were issued and applied for well before the AIA went into effect. CBM review changed the nature of the quid pro quo between trading technologies and the government when TT decided to disclose its invention publicly. How so? Because for the It's a good question, because for the first time ever, it allowed the government to revisit 101, question of eligibility, in an adversarial proceeding. Is that really where your constitutional challenge boils down to, given the precedent that's out here? That's the crux of the argument here, because... Given the precedent, that's the entirety of the argument, isn't it? Well, I think oil states signal that patents are still property under the Fifth Amendment of the Constitution for due process and takings. And we haven't actually said that yet, but that's a good answer. And I think that it is a material change, if you're for the first time, allowing the Patent Office to take a second look at 101. That was not the case when these patents were filed for, and it's a lower standard of proof than in a district court. When we reviewed the constitutionality of old-fashioned re-exam, right, in a precedential opinion, we said it passed muster under the Constitution, right? That's correct. And in that case, all the grounds to which the patentee was being exposed in our re-exam were retroactively new, right? That's true, but that was ex parte re-examination, which is materially different than inter-parties re-exam or CBM review, where you've got the other side. I'm just trying to narrow it down, because your argument to say, oh my goodness, it's not fair to expose us to 101 retroactively, because that's new. And I'm saying, I don't want to buy that argument, because the poor person that got nicked on the first old-fashioned re-exam got nicked on a whole mess of grounds that were brand new. So now you're telling me that the between an old-fashioned re-exam and an IPR? That's what you seem to be saying? Well, I think the difference between an old-fashioned re-exam versus CBM, unlike IPR, CBM allows you to revisit 101. But if you look at the Patlex, the Joy cases that the government relies on, there wasn't actually a full invalidation of the patent in those cases. Was ex-parte re-exam similarly unconstitutional when it was adopted for retroactive application to patents that already existed? Yeah, it's a little different, because it wasn't an adversarial proceeding. Was inter-partes re-exam unconstitutional when it was adopted? No, because it was applied only prospectively. So Congress didn't try to retroactively apply inter-parties the way they did with CBM review. I don't know the answer to this, that might be useful. Are you saying you couldn't bring an inter-parte re-exam on a patent that had issued prior to the adoption of the inter-parte re-exam statute? Correct. Okay, so IPRs and CBMs are the first instance where it has applied retroactively? The CBM is a first-time 101. And IPRs as well, correct. IPRs can also apply retroactively, correct? Correct. So your argument about CBM and 101 would have to apply equally to all of IPR practice, correct? It could be carved out from IPR practice, because unlike IPRs, which we've known about re-exam at this point, so our argument is slightly different, because given where we're sitting today, when these were filed in 2015, 2016, we knew about re-exam, but we didn't ever know, wasn't even on the slate of possibility. If you're looking at when the patent was filed, and I'm sorry, that was 2004, there was no 101 second look by the patent office to change their mind. It's something that was once eligible, now isn't. But there was in the district court. The different standard of proof. Patents are entitled to presumption of validity, there's a burden of proof of clear and convincing evidence, and here it's a preponderance. That's the only difference, is the evidentiary burden, if there is a fact question. But 101's a question of law, and only thus far in my experience has occasionally had fact questions. So in front of the PTO, for the most part, like in this case, it seems to me, your 101 case is entirely a question of law. So the evidentiary burden becomes a non-issue. There's no difference between a district court evaluation and a PTO evaluation, if there isn't a question of fact. Well at step two, your honor, we did cite extrinsic evidence that the board just glossed over and didn't consider. And so we submitted expert testimony- Well, the presiding judge is suggesting that a facial attack won't suffice if there are circumstances in which there'd be a CBM review that would not create a constitutional problem. So it'd be an as-applied. I think that was what's in the air. Is there any legitimacy to that way of looking at the problem? Because if you do have a pure question of law, and there was no dispute that the adjudication would be on a level playing field, PTO versus a district court, then the forum distinction would seem to be irrelevant. Well, I think there's a big difference in the forum between the patent office and a district court in terms of the procedures, in terms of the substantive burden of proof is the largest difference, but there's also no real ability to amend. I'm sorry. Would you rely on greater discovery? I'm sorry? In the district court, there's greater discovery, isn't there? Absolutely. When you try to get discovery in the patent office- What other indicia of the difference in the trial in the two forum would you point to, other than discovery? Other than discovery, there's one thing about- Jury trial is out the window, so assuming for purposes of argument, what besides discovery? Well, I think the ability to introduce evidence is much more curtailed with the patent office. And then one point on re-examination that I wanted to also point your honors to is, there really hasn't been a meaningful opportunity to amend in CBM procedures up until, I guess, recently, but when we were involved in those cases, there was no meaningful ability to amend. I mean, I think there were just two out of maybe 100 or dozens and dozens of cases where the patent office would even consider that or allow that. And so that's another substantive difference between, if you're just looking at re-examination versus CBM review. All right. Well, let's hear from opposing counsel, please. Mr. Bambin. Thank you, your honor. And may it please the court. I'd like to begin by answering Judge Moore's question. You asked whether the only difference between the figure two prior art GUI and what's claimed in the 556 patent is whether there's a profit and loss column. And the answer is yes. The 556 claims are merely about using the computer as a tool to compute and display profit and loss information. This is something that was done by traders before manually and mentally in their heads. That's what the patent actually says in the background section. And that is a finding that the board relied on. That's an admission that the board relied on. Is there any possible way that the trading techniques at issue here could improve the functioning of a computer? No, your honor. The computer is doing exactly what the computer... I tried mind gaming it. No, your honor. I don't believe so. I think that the computer is doing exactly what the computer was designed to do, which is to compute a profit and loss or compute information and then present the results to the person that's using it. What does improve the functioning of a computer mean? Give me an example. Sure. Quickly of something that would improve the functioning of a computer. I think we can look to this court's decisions in cases like Enfish. In Enfish, we had a new way of organizing information that was suitable for databases. It was a self-referential data table. That was a new way of organizing the information so that the database could be accessed in a more efficient manner. It required less computer memory. That's an example of a computer-based improvement. This is not a computer-based improvement. Like I said, this is just automating the manual process of computing and displaying profit and loss information. And Judge Wallach, you asked, well, can't we compute more than one... The answer is yes. And if you look at the claims, claims only require a plurality that is two. And so if you're looking at a graphical user interface and you know that you're going to make $10 at one price level, the next price level, you're going to make $11. You know this information. I'd like to discuss Core Wireless briefly because opposing counsel brought that up. We believe Core Wireless is very different than the PatNet issue here. Core Wireless, it was about a new way of navigating information and computers that had small form factors, small displays. Previously, a user would have to drill through a lot of different screens in order to find a function or the data that they were looking for. And the improvement there, it provided that ability without having to drill through those screens and find that information. And so it was a new way of navigating information, which is very similar to the other case that Trident Technologies raised, which is Data Engine. Now, Data Engine is, we believe, very instructive here because Data Engine, it wasn't a complete victory for the patent owner. And I think this court did a good job of defining a line in that case between patents or computer implemented claims that were eligible and ones that were not. Because there was a patent that was directed to tracking changes in spreadsheets. There, the specification, it said that tracking changes was something that was arduous for users, but it was something that was done manually. And so the claims to implementing that process, implementing that manual process, those did not survive. Whereas the majority of the TAB patent claims, they did survive. Another thing that Trident Technologies mentioned is that they presented declarations from their experts. One thing I just want to point out is that the board found, and it's true, that those experts didn't actually analyze the 556 patent. Trident Technologies recycled those from other patents, or from other cases that talk about other patents. And so we don't think that they should carry any weight. The board didn't think so either. Constitutionality. So I will briefly mention the constitutionality issue. We are splitting our time with the government to address that. But we agree with the court, I think, as far as, to the extent that the court believes that Trident Technologies properly raised this issue in the blue brief, and that it's retroactive legislation, which I know the government is disputing. We believe that the reasoning in this court's Petlex decision in MCM Portfolio should be followed. There, the court found in Petlex that there was no due process, Article III or Seventh Amendment violations for the retroactive application of the new ex parte, at that time, new ex parte re-exam statute, to Mr. Gould's laser patents. Same reasoning applies here. Unless there are any questions, I will cede the rest of my time and turn this over to the government. You gave her one second. Great, that was nice of you. Come on up, Ms. Allen. Ms. Allen, I assure you, my placement on this case, unlike yours, is random. I mean, I feel like we've done this dance quite a few times already. It's good to see you again. Why didn't you say the same thing? Thank you, Your Honor. We're here to address the constitutional. Oh, I'm new, so I'll listen. I haven't seen you before. Thank you, Your Honor. We're here to address the constitutional issues. Just to pick up where the previous discussion left off, we think that the constitutional arguments plainly fail under this court's decision in Petlex and Joy Technologies. With respect to the due process claim, the question is whether Congress had a rational basis for applying a covered business asset review to patents that were already in existence when the statute was passed. What about takings? Can you go straight to that? Sure, yes, Your Honor. We've had this conversation before, but let's play it out again. Sure. Well, I mean, I guess first of all, they're focused on the 101 issue and the fact that prior to the AIA 101 issues could only be litigated in district court, whereas now they can be brought before the agency and that the burden of proof is different. In Petlex, the patent holder made the same argument. They argued that the fact that the presumption of validity didn't apply in the re-examination proceedings, that their property had been taken. And this court rejected that argument on the ground that a particular procedure that governs is not property protected by the Constitution. And so we think that that reasoning fully applies here with respect to the main argument that they're making. Just more generally, we also think that property has a right to win. We think that there is no taking here because a patent would only be canceled after this court has affirmed the board's determination that these claims are unpatentable. And just as in district court litigation, the fact that a district court would find a claim invalid doesn't mean that there has been a judicial taking. Instead, it means that they never had it. My questions about this remain unanswered for me. Which are, you do have a different standard of review in PTO versus the district courts. And we have a different standard of review for fact questions from the PTO versus the district court. So one of the difficulties with the property right, I think you'll follow me as I walk through this, is if a district court decides it and there are fact questions and the district court is the decision maker, he decides those fact questions under the clear and convincing evidence standard, which is much more favorable to the patentee. Then when that comes up on appeal to us, we review it under the clear error standard. When the patent office decides these questions, they decide it under the same fact question and they decide in the preponderance of the evidence standard. When it comes up to us, we then give their decision substantial evidence deference. Now, I know I personally find any difference between clear error and substantial deference, substantial evidence virtually impossible to quantify. Nonetheless, it has been deemed by the Supreme Court a material difference. So how do we not have a taking under those circumstances where both the initial standard being applied to the property right is lower and then greater deference is being given to the taking away of the property right just on the fact questions, of course. Well, again, Your Honor, I mean, as this court explained in Patlex, the reason that the presumption of validity applies is because it comes from a presumption of administrative correctness and is giving deference to the PTO's determination that it's a valid patent. So it makes sense, of course, that it wouldn't apply in a proceeding before the agency where the agency itself is saying that a claim is unpatentable. And in Patlex, this court held  which is where the clear and convincing evidence standard comes from, that that is just a procedure and there is no property right in particular procedures for taking purposes. I don't understand that's just a procedure. I don't know. I don't really understand what that means. I mean, certainly the Supreme Court's reaffirmed recently that there is a property right in the patent. Yes, and we're not disputing that. What I'm saying is that what they're claiming is a property right in the procedure by which the patent's validity is adjudicated. And in Patlex, this court held that there is no property right in the particular procedures for adjudication of the underlying property right. So you, in essence, are treating the question of the presumption of validity, yes or no, as the same as these evidentiary standards? In Patlex, there'd be the challenge as to whether or not the fact that you have a presumption of validity in one place and you don't in the other, is that going to give you any constitutional problem, right? And we said no. Yes, Your Honor. And the clear and convincing evidence standard the Supreme Court said in Microsoft versus I4I comes from the presumption of validity. Yeah, and you're saying it just falls in the same bucket. Yes, Your Honor. And that's a very interesting question because the presumption of validity probably has got a lot less bite in the way cases get litigated in that comparison that you're making than does the standard of proof and the standard of review. And by the way, the standard of review didn't differ at the time Patlex was decided. Zirco decided the standard of review should differ after that. So this really does change Patlex. And with all due respect, I'm not sure we're bound by it anymore because at the time Patlex was decided, we applied the same standard of review to both PTO and district court decisions. We don't do that any longer. Supreme Court told us that was a no-no. We now give more deference to PTO decisions. Doesn't that change the landscape a little bit? I don't think it does, Your Honor. Again, I think we're talking about whether a procedure about how the underlying patent property right is adjudicated. But it doesn't have the same level of review by us any longer. We now have the removal of a patent right by an agency under a lower standard. Maybe Patlex governed that. But now we don't have Article III review, which is at the same level as it would be from the district court. We have lesser scrutiny in the Article III review process of the removal of the property right. That's not a taking? Less scrutiny, less reviewability by an Article III tribunal? Your Honor, I don't... What if they came along? Let me make this crystallized for you because it's all coming together for me beautifully. What if all of a sudden Congress said, you no longer have a right to appeal IPRs to the Federal Circuit, full stop? Would that be a taking? That's where I'm going. Can we lobby for that? No, no, I mean... I didn't say that. I mean, can we lobby against that? Go ahead. My question would be, I think to your opposing counsel more than to you, what if we amend the federal rules of evidence or the federal rules of civil procedure and modify discovery, right, and limit the number of interrogatories that can be asked? Is that a taking? Your Honor, I mean, in our brief, you know, we've cited Patlex, we've cited a Supreme Court case that both say that there are not property rights in particular procedures for how something's adjudicated. Again, our primary submission is if you step back and look at their takings claim, what they're saying is that they have a property right in a patent that never should have been issued because from the time it was issued, it didn't meet... I know, I get all that, but I guess I'd really like an answer to my question. If Congress stepped in and said there is no appeal to any Article III tribunal of IPR procedures, would that be a taking of the property right of the patent when the Patent Office alone takes it away through IPR and there's no right to Article III review? I mean, Your Honor, that would present more, you know, a more difficult takings argument. No, but you said procedures off the table. That's what you suggested. Procedure is off the table. That's what slows from Patlex. Is this part of procedure? Your Honor, I think... If you eliminate Article III review of the removal of a property right, is it a taking? Your Honor, that is not with... Is it an issue in this case? Let's hypothetically say your answer is yes. You're not saying it's yes, but we're hypothetically saying it's yes. You're hypothetically saying, yes, I think that might be a taking, Your Honor. So then how would reducing the level of scrutiny an Article III tribunal can give to an administrative agency not be a taking if eliminating review was? How about when you reduce the scrutiny they can give? Well, Your Honor, again, I mean, if we go back to Patlex, at that time, there was no way the agency could take it at all. And so whatever level of scrutiny, that is a much, much bigger change than what you're talking about here, which is, I guess, is the difference between the standard of review that this court applies when reviewing district court proceedings and that this court applies when reviewing agency proceedings. And again, I mean, in Patlex, there was no way... This court stated that there was no way when the patent was issued that the patent could have been found unpatentable, that the claims could have been found unpatentable by the agency. And so that is a much, much bigger change than what we're talking about here. And this court's... But Patlex was deciding re-exam, right? Yes. And was it retroactive at the time? I don't remember. Was it retroactive? The re-exam statute allowed to be applied to already issued patents? Yes, it did apply to already issued patents. And that's the precise issue. So it's only the inter-parte re-exam that wasn't allowed to be applied? That's correct. Okay. That's correct. And so in Patlex and in joint technologies, this court has rejected this argument twice. And so we think that... Maybe the third time's the charm, Ms. Allen. I don't know. I don't think so, Your Honor. Does the board have the authority to declare that the CBM procedure is unconstitutional? Your Honor, what we think could have happened... Yes or no? What we think the board could have done in this case. But I want you to answer his question first. He asked you a yes or no question. Now, do they have the authority? If the question is, you know, what could they state? Let's say, for example, you're arguing that we shouldn't hear this because trading technology didn't present this challenge to the board. So let's go back and you're sitting at the board and they present the argument to you. What's the board going to say? So what the board could have done if trading technologies had raised this argument is the board could have declined to institute covered business method review of this patent. If they thought that... Just because they felt like it? If they thought that the constitutional argument was correct, they could have declined to institute. Why? Because the statute simply says that the director may not institute... Well, the director could decline it on the grounds he didn't like the color of the tie. That the person was wearing, right? We think that the board could have declined to institute if they thought that instituting would violate the constitution. On the merits, does the board have the authority to hold anything unconstitutional? Yes or no? Your Honor, I'm not sure if the question is what remedy... If you're asking me what remedy the board could provide if trading technologies had made this argument, my answer is... Somebody forfeited an argument here because they didn't make it below. If they're making it below was... A few times. No reason to make it below because there was no way they could get a relief. And you're telling me the only way they could get the relief was if somebody said, well, I'm just not going to institute and my institution decision is unreviewable. That doesn't help me. Your Honor, I think... Our point is that we think just as an NRA DBC, it would not... Really don't want to answer the question, do you? I mean, what would happen... What would happen if the board actually greeted the argument and held the CBM thing unconstitutional? Well, I think if the board thought that CBM review... And there was an appeal up here to us. And the question is, well, did the board have the authority to do that? What's the answer? Your Honor, I think what the board would have... Can't you answer the question? Well, I... Michelle, let me be clear. I'm not letting you sit down until you answer the question. I'm not kidding. I want you... Because I've asked you this question multiple times and I let you evade it. This is your... Sorry, I'm 15th time in front of me, basically. If you combine all the different cases. Yes or no, does the board have the authority to render the statute unconstitutional? So I'm not trying to be evasive. The... If the question... Why didn't you say, I don't know? Is it that you don't know? You haven't been instructed. You've been instructed not to answer the question. In my view, I am answering the question. So I apologize if you think I'm being evasive. Well, really, because yes or no... When a question starts with yes or no and you don't answer yes or no, I don't know how, in your view, you could be answering the question. Yes or no, does the board have the authority to hold the statute unconstitutional? I think you're asking me about the remedy the board could provide. Does anybody in the audience misunderstand my question? Yes or no, does the board have the authority to render the statute unconstitutional? I think that the board could opine on whether the statute is unconstitutional and the remedy that the board could provide to a patent holder that argues that the statute is unconstitutional is that the board could decline to institute the proceedings. So let me be clear. Your answer is no. The board does not actually have the authority to hold the statute unconstitutional. I apologize. I don't know what you mean by that. If you mean issue an injunction such that the statute couldn't be applied in other cases... I don't issue an injunction when I hold a statute unconstitutional, do I? Do I issue an injunction? I did it not long ago. I held a statute unconstitutional. Did I issue an injunction pursuant to that? No, I assume not, Your Honor. Right. So why would the board have to issue an injunction? Can it adopt a holding that the statute is unconstitutional and does that thereby render the statute unconstitutional? If the court thought the statute was unconstitutional... Not the court, the board. Sorry, I apologize. If the board thought the statute was unconstitutional, it could terminate the proceedings.  I think that the board... I'm not asking you what remedies you think the board has. The remedy is not to write a decision in which they declare the statute unconstitutional. Well, aren't you saying they could write an opinion declining to institute and saying... On the ground that it's unconstitutional. We're doing this because it is unconstitutional. Exactly, or they could terminate the proceedings and they could say that they're doing that for the very same reason. And I think... But unlike a court, they can't hold the statute unconstitutional, can they? Can I hold a statute unconstitutional? Yes, you can. Yes, I can. That was easy for you to answer, wasn't it? Can the board hold a statute unconstitutional? Why isn't it that Judge Moore can do it? She's an Article III judge, right? Yes, Your Honor, but the Supreme Court has made clear that there is no categorical bar to agencies addressing constitutional issues. And this court... They can say they think so, but can they hold it unconstitutional? And they say this statute is unconstitutional and therefore it may not be applied. They could say, and so we're not going to apply it in this case. That's because a different section gives agency discretion to do it whenever they want. So that's not the answer. You know the answer I'm looking for. Does an Article I tribunal have a right to hold a statute unconstitutional? And I don't know the answer to that question in the abstract. All I can tell you is that we think here, just as in NRA DVC, there is something that the board could do. The board could opine. It could issue a decision declining to institute on the ground that it... Subjecting the patent to CBM review would violate the Constitution if that's what the board thought was the case. It has addressed constitutional issues. And let me just ask you this question. Wouldn't you agree that this relief that you're saying that the board could give you is not quite as much relief as you would get if somebody actually declared the statute unconstitutional? You mean if a court did? Yeah, sure. I'm thinking about the reliefs. TT is down there, and they want to have the statute declared unconstitutional. Because of this case, but also because of a whole mess of other cases, and because of the risk of being thrown into these processes time and time again, which they're poster boy to show how that happens. And so they want the statute declared unconstitutional, not just for this particular case, but to protect them. So that's the scope of relief they want. And you've told us that the board can't give them that scope. The most the board can say is, we're just not going to institute this one. And that's why... The fact that the board could give them relief, could obviate their constitutional challenge... Let's put it this way. Let's put it this way. If the board opined that the statute was unconstitutional, and nobody appealed from that, would the statute then be unconstitutional for all other purposes? Relating to the holding. Well, I don't think it's that different than when a district court issues a declaratory judgment. It's binding on those parties. I understand that. But if a district court says a statute is unconstitutional, and it's not appealed, at least in that district, it's unconstitutional. Exactly. In that district, it has between those parties, I think that we're saying... And anyone else. The court has held it unconstitutional. I shouldn't get too far down this road as a government lawyer and opining... That's why I said you could answer, I don't know. What the preclusive effects are. But I think our point is just that, just as in Henry DBC, the agency could have done something to address the constitutional challenge that they are now raising before this court, that they didn't raise before the agency. And so we think it's forfeited. But as I've explained, we think that it's very clear on the merits that we win, even if this court chooses to reach this... I'm sorry to have used up all your time on this. I raise this because my suggestion would be that the department gives some consideration to whether or not they want to lead with their glass chin on the question of whether or not this argument was forfeited. I mean, your lead argument as to why we shouldn't be hearing this is that TTL was forfeited its right to have an Article III court in this case adjudicate that issue. And I think this colloquy has demonstrated the... the flimsiness of your forfeit argument. Well, I respectfully disagree. We think this case is just like Henry DBC and that we have an institutional interest in courts enforcing the general rule that litigants need to raise issues before agencies. The Supreme Court recognized in Elgin and Thunder Basin that constitutional issues have to go through the agency procedure. They can't just be brought in district court and that there is value to having agencies address constitutional issues that can later aid a court in its adjudication of those issues. You know, Ms. Allen, I used to think I had the patience of a saint. And when my kids threw temper tantrums, I could outlast them. I could sit there throughout the entire obstructionist behavior. They would be laying on the floor in an airport, kicking and screaming. People would be staring at me as they walked by. And I outweighed them. I outlasted them. I have a three-year-old. I'm very familiar. Today, you outlasted me. Sit down. I apologize. Thank you, Your Honor. I think I have three minutes reserved for rebuttal. I just wanted to make a few points. So are you going to answer the question that I raised with your opposing counsel and said I was going to ask you about a change in the rules of procedure? The changes in the rules of procedure can be very substantive. So if the administrative office of the courts and the courts propose to Congress that we limit the number of interrogatories to 10, that's a taking? I'm not sure that that is enough to constitute a taking. But when you've got burdens of proof that are different, that has been declared by courts in other cases as being a substantive change that would affect the taking. And then I wanted to answer just one other question about PATLEX. And just to be clear, that was an ex parte reexamination. So again, very different than an adversarial proceeding like CBM review. And then on 101, I didn't get to these points. But the board overgeneralized the claims. They were not directed to fundamental economic practice. And because the board just grossly overgeneralized the claims, and then they looked at this phantom overgeneralization of what the claims were really directed to. From there, from that flowed all the errors. And this isn't just something that is done. So if we take your initial premise as true, instead of what we seem to believe, you would be right. Yes. And this isn't just something that was done in the head. You know, this is something where you've got indicators that are moving relative to a P&L value axis. And the board's overgeneralization of the claims as being merely directed to providing a trader with financial information would cover every trading GUI ever made. That was way untethered from the specific claim limitations and broadly applied to almost any trading GUI ever made. And rather, our claims set forth the very specific structure and makeup and functionality of those claims. And that's why they're very different than the cases cited by IB. And they're much more akin to cases that have found that improvements to graphical user interfaces are eligible, like Core Wireless, Data Engine, CQG, and so on. And with that, if there are any more questions, I can sit down. Okay. I thank all counsel for their argument. I just want to add for the record that I very much appreciate when I get to see young partners or more junior attorneys have an opportunity to argue. And I think you did the best you could with a bad case. So, all right. Next case. Thank you very much. Thank you.